UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. '08 MJ 1534 |
| | ) | |
| v. | ) | COMPLAINT FOR VIOLATION OF |
| | ) | |
| LUIS FRANCISCO ALARID, | ) | 21 U.S.C. §§ 952, 960, 963 – Conspiracy to import marijuana; 18 U.S.C. § 371 – Conspiracy |
| Defendant. | ) | |

The complainant being duly sworn states that:

Count 1

Beginning on a date unknown and continuing up to the filing date of this complaint, within the Southern District of California and elsewhere, defendant LUIS FRANCISCO ALARID, did knowingly and intentionally conspire with other persons known and unknown to import 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952, 960, and 963.

//

//

2

## Count 2

Beginning on a date unknown and continuing up to the filing date of this complaint, within the Southern District of California and elsewhere, defendant LUIS FRANCISCO ALARID, did knowingly and intentionally conspire with others known and unknown to commit an offense against the United States, to wit: to bring to the United States for the purpose of private financial gain, aliens, knowing and in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, and reside in the United States; in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii).

In furtherance of said conspiracy and to effect and accomplish the objects thereof, the following overt act, among others, was committed within the Southern District of California, and elsewhere:

1. On 5/3/08, members of the conspiracy drove four vehicles containing numerous illegal aliens through the Otay Mesa Port of Entry.

All in violation of Title 18, United States Code, Section 371.

This complaint is based on the attached statement, incorporated herein.

_____
TERRY C. REED, JR., Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on May 16th, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

3

## STATEMENT OF FACTS

1.      I am a special agent with the Federal Bureau of Investigation and have been so employed for about 4 years. The following is based in part on my own investigation and information from other law enforcement officers. Dates and times are approximate.

2.      At all times relevant to this complaint, Luis Francisco Alarid was employed by the Department of Homeland Security, Bureau of Customs and Border Protection, as an officer assigned to the Otay Mesa Port of Entry (POE) in San Diego County.

3.      On 2/14/08, agents watched as Alarid manned primary lane 4 at the Otay Mesa POE. At 12:15 am, a minivan approached Alarid's booth. Alarid took something from the driver and made a swiping gesture in his booth. Alarid then admitted the van without further inspection. Agents saw the minivan's rear license plate as it passed their position nearby. The first and last digits were taped over which, I believe, was designed to prevent the automatic license plate reader from accurately reading the plate and retrieving vehicle information. Agents later determined that the plate reader responded "no plate." Upon obtaining that response, Alarid should have visually checked and manually inputted the rear plate himself, which he did not do. The minivan, followed by a Toyota, drove to a house on 5th Street in Chula Vista where the driver got out. Agents could not see what happened at the minivan thereafter, but the Toyota circled the block several times. I believe the Toyota was conducting counter-surveillance. Several minutes later, the minivan moved to a parking lot on E Street. The driver got out, walked to a trolley station, and made a call. Shortly after, a Chevrolet registered to Israel Alarid picked up the driver and took him to the San Ysidro POE. Israel Alarid is believed to be defendant Luis Alarid's cousin. Meanwhile, agents maintained surveillance on the minivan at the parking lot. Several hours later, patrol officers responded and determined the van was stolen. They found nothing inside. Based on events below, I believe the van was used to transport aliens and/or narcotics into the United States. I believe the aliens and/or narcotics were offloaded at the house on 5th Street.

4.      On the same date, at 12:26 am, agents watched as Alarid manned primary lane 3 at the Otay Mesa POE. A minivan approached Alarid's booth. Agents later saw that the first and last digits on the rear plate were also taped over. The plate reader again responded "no plate." Alarid did not visually inspect the rear plate and instead admitted the van without further inspection. The van drove to a shopping center in Chula Vista and parked. The female driver got out, walked to a convenience store, and hailed a cab that took her to the San Ysidro POE. She ran into Mexico. Meanwhile, at the shopping center, agents maintained surveillance on the van. Jose Angulo eventually arrived and started driving away in the van. Patrol officers stopped Angulo and found ten illegal aliens, not including Angulo, inside the passenger/cargo area.

5.      On 3/5/08, at 11:25 pm, Alarid arrived at the employee parking lot for the Otay Mesa POE and entered the building. Shortly after, he returned to his car for about three minutes. Agents could not see what he was doing, but based on events below, I believe he was phoning smugglers in Mexico to notify them which lanes he was scheduled to work that

4

night. On 3/6/08, at 12:56 am, agents watched as Alarid manned primary lane 4. A white minivan approached. The first and last digits on the rear plate were taped over. The driver handed Alarid some documents. Alarid looked briefly at them, looked over his shoulder, turned slightly towards his booth, did not visibly swipe or key in anything, then turned back to the driver, returned the documents, and motioned for him to proceed forward. This sequence took about four seconds. Several seconds later, Alarid's relief walked into his booth. I believe Alarid noticed his relief approaching and determined he did not have time to make gestures consistent with swipes or keyboard entries. The van drove to a residence on Estelle Street in San Diego. The van's doors opened, but agents could not see if anyone got out or walked inside. Several hours later, at 4:15 am, five individuals walked out of the residence, got in a car, and eventually headed eastbound on I-94. I believe the Estelle Street house was used to stash aliens and/or narcotics offloaded from the van.

6. On the same date, at 12:59 am, agents watched as Alarid manned primary lane 3 at the Otay Mesa POE. A red Ford Windstar minivan approached. The van had commercial license plates which, later investigation determined, belonged to a GMC pickup truck. This information should have appeared on a screen in Alarid's booth. Alarid instead admitted the van without further inspection. Agents were unable to follow, but at 1:27 am, Chula Vista police officers responded to a call of suspicious behavior at a van in the parking lot of a donut shop. Officers found four illegal aliens and about 264 pounds of marijuana inside the van, a red Ford Windstar with commercial plates. The 21 bundles of marijuana were sitting openly in the van's cargo area, under two blankets.

7. On 3/12/08, Alarid put down $13,000, all in $100 bills, at a San Diego motorcycle store towards the purchase of a motorcycle. Specifically, records indicate Alarid put down $3000 in cash, then returned later that day and put down an additional $10,000 in cash. (Business transactions over $10,000 in cash must be reported to the federal government.) On 3/13/08, Alarid paid the remaining $2500 balance for the motorcycle, also in $100 bills. At the time, Alarid had a checking account and several credit cards. Income from his employment with DHS was deposited directly into his checking account, and his checking account contained no corresponding withdrawals. Accordingly, I believe the cash deposited for the motorcycle was proceeds from illegal activity.

8. On 3/12/08, at 11:30 pm, Alarid arrived at the employee parking lot for the Otay Mesa POE, parked, and walked inside. Shortly after, he returned outside and spent several minutes talking on a cell phone. Alarid then walked back in the building. I believe he was notifying smugglers in Mexico which lanes he was scheduled to work that night. On 3/13/08, at 12:56 am, Alarid was manning primary lane 3 when the same white Ford minivan from 3/6/08 approached. Later investigation determined the van's license plate–the same plate that was partially taped over on 3/6/08–belonged to a Plymouth, which should have appeared on a screen in Alarid's booth. Alarid contacted the driver, turned towards his booth (where his actions could not be seen), then turned back to the driver and motioned him through. This sequence took about six seconds. Agents followed the van until, at 1:05 am, patrol officers stopped it on I-905. The driver was Cesar Alarid, defendant Luis Alarid's uncle and Israel Alarid's father. Openly situated in the rear passenger/cargo area of the minivan were 18 illegal

aliens. As officers helped the aliens from the van, they smelled a pungent odor. Officers thereafter found about 173 pounds of marijuana in garbage bags inside the van.

9. On 4/4/08, at 1:19 am, Alarid was manning primary lane 4 at the Otay Mesa POE. At the time, a Nissan Pathfinder was third in line for that lane. Alarid's relief appeared, causing Alarid to switch to primary lane 3. At 1:20 am, the driver and front passenger in the Nissan exited the vehicle and ran back to Mexico. Nine illegal aliens were left inside the Nissan. CBP officers, including Alarid, secured the aliens. I believe that the driver and front passenger fled because they saw that Alarid was no longer positioned to admit them into the U.S.

10. On 5/3/08, at 1:47 am, Alarid was manning primary lane 5 at the Otay Mesa POE. Three pickup trucks and a sedan, as well as a truck that appears uninvolved, were in line one after the other for lane 5. All the pickups had covers over the rear beds. Alarid admitted all the vehicles in less than 90 seconds. For each vehicle, Alarid took something from the driver, stepped into his booth, then handed something back to the driver. The pickups and sedan drove to an alley behind a house in Chula Vista. Agents later searched the premises and found 30 illegal aliens inside an 8 x 12 foot freestanding structure in the rear yard and an additional 10 illegal aliens inside the rear house.

11. One individual (MW-1) said she was a citizen and resident of Mexico with no lawful right to be in the United States. MW-1 said she arranged to enter the U.S. through a person in Mexico. The fee was $5,000. The person guaranteed the trip and said the price was high because he worked with an immigration officer who would wave everyone through. MW-1 and the others were placed aboard three trucks and a car. MW-1's truck contained about 17-18 other aliens, and she was placed near the gas pedal. The driver indicated he was waiting for the immigration officer's mother to tell them which lane to use. MW-1 subsequently heard a radio call in which a female voice told them to go and which lane to use. The truck drove forward. Shortly after, the driver yelled that they had made it.